| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* THOMAS LINDLY, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Case No. _____ |
| ALLIANT TECHSYSTEMS INC., a Delaware corporation, ) ) ) | **FILED UNDER SEAL** |
| ) ) | **JURY TRIAL DEMANDED** |
| Defendant. ) ) | |

### **FIRST AMENDED *QUI TAM* COMPLAINT**

**EMPLOYEE RIGHTS LAW FIRM --
LAW OFFICES OF MARK A. JESS,
LLC**

By:_____ /s/ Mark A. Jess_____
Mark A. Jess, MO. Bar # 37946
Christie Sherman Jess MO Bar #44919
John J. Ziegelmeyer MO Bar #59042
Kansas City Livestock Exchange Building
1600 Genessee, Suite 842
Kansas City, Missouri 64102
816-474-4600
Fax: 816-474-4601

**THE LUNCEFORD LAW FIRM**

David A. Lunceford, MO Bar # 47014
201 N.E. 1st Street
Lee's Summit, MO 64063
816-525-4701
Fax: 816-347-0366

**ATTORNEYS FOR RELATOR**

RELATOR THOMAS LINDLY brings this *qui tam* action in the name of the United States of America by and through his undersigned counsel and states and alleges as follows:

## Summary Introduction

1.	This is an action by former *qui tam* Relator Thomas Lindly ("Lindly") to recover damages for his wrongful discharge by Defendant Alliant Techsystems, Inc. ("ATK") in violation of 31 U.S.C. § 3730(h).

2.	Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed that ATK falsely stated that its .50-caliber ammunition conformed to government specifications, when, in fact, a substantial portion of this ammunition was non-conforming material ("NCM").

3.	Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed ATK knowingly commingled NCM with conforming ammunition so that NCM could be sold to the U.S. Army instead of being sent to salvage.

4.	Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed this practice saved ATK millions of dollars in labor and material costs. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed the practice also resulted in U.S. Army personnel using inferior ammunition.

5. Lindly was a Prime and Load Area Manager in the building that manufactured .50-caliber ammunition at the Lake City Army Ammunition Plant in Independence, Missouri.

6. Lindly participated in management meetings where he reasonably and in good faith believed the practice of commingling NCM with conforming ammunition was openly discussed. Lindly asked questions about this practice and, in effect, conducted an informal investigation in to what he reasonably and in good faith believed to be not only a fraud upon the United States but also a practice that could have placed United States military personnel engaged in war on behalf of our country in unnecessary jeopardy. Lindly complained to his supervisors about this practice, resulting in his eventual termination. On information and belief, based in part on ATK's previous experience in a *qui tam* suit concerning allegedly non-conforming ammunition (*Neal v. Honeywell, Inc. and Alliant Techsystems, Inc.*, N.D. Ill., Case No. 93C1143), ATK believed Lindly was either acting in furtherance of a private *qui tam* action or was assisting a False Claims Act investigation/suit being brought by the federal government.

**Parties**

7. Lindly is a citizen of the State of Missouri.

8. ATK is incorporated in the State of Delaware, and has its headquarters at 7480 Flying Cloud Drive, Minneapolis, Minnesota. ATK is a publicly-traded company registered on the New York Stock Exchange.

**Jurisdiction and Venue**

9. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and specifically under 31 U.S.C. § 3730(h).

10. This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

11. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because ATK transacts business in this District and committed acts proscribed by 31 U.SC. § 3730(h)—acts giving rise to this action, in this District.

12. Before filing his original Complaint, Lindly served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possessed, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

13. Lindly has complied with all other conditions precedent to bringing this action.

## Factual Allegations

*Alliant Techsystems, Inc.*

14. Defendant ATK is a premier aerospace and defense company and leading supplier of products to the U.S. Government, allied nations, and prime contractors. ATK is also a major supplier of ammunition and related accessories to law enforcement agencies and commercial customers.

15. ATK conducts its business through three business groups, ATK Mission Systems, ATK Space Systems and ATK Armament Systems.

16. ATK Armament Systems is the largest ammunition manufacturing entity in the world, supplying products to the military, hunting, sport shooting, homeland security, and law enforcement markets.

17. In fiscal 2008, ATK had total sales of $4,171,725,000. Sales to the U.S. Government contributed approximately 78% of these total sales.

*ATK Lake City Army Ammunition Plant*

18. ATK, through its ATK Armament Systems group, operates the ATK Lake City Army Ammunition Plant ("LCAAP") in Independence, Missouri.

19. LCAAP is the Department of Defense's only small-caliber ammunition production facility. It lays within the city limits of Independence, MO, on the eastern edge of the Greater Kansas City metropolitan area. It encompasses 3,935 acres with a total of 511 structures with over 420 buildings being utilized in active day-to-day fabrication, manufacturing, and testing of small arms.

20. With the exception of the five-year period between the end of World War II and the beginning of the Korean conflict, the facility has been in continuous production since October 1941.

21. ATK took over operation of this facility on April 1, 2000 and since that time has operated it under a contract with the federal government.

22. ATK's production contract requires ammunition to meet rigorous manufacturing specifications in order to be sold to the U.S. Government.

*Manufacture and Testing of .50-Caliber Ammunition at LCAAP*

23. LCAAP is the only facility manufacturing .50-caliber cartridges for the Department of Defense in the United States.

24. The manufacture and packing of .50-caliber ammunition at the LCAAP is sub-divided into five sections: Bullets, Casings, Prime and Load, Gauge and Weigh, and Packing.

25. Prime and Load is where the ammunition components are assembled into a completed cartridge.

26. Primed casings are conveyed along a belt device until they reach a fill point. There, a machine operator fills each primed casing with the requisite amount of powder. A bullet is then inserted into the primed casing and the top of the casing is crimped around the base of the bullet.

27. The completed cartridge is conveyed along a chute and deposited into a four-wheeled cart or "buggy" that sits on the end of the chute leading away from the point of cartridge assembly.

28. Once a buggy has been filled with completed cartridges, it is wheeled to Gauge and Weigh. There, cartridges are gauged to ensure they are the correct size to chamber properly in the weapon system, and weighed to ensure that they contain sufficient propellant to expel the bullet projectile.

29. The ammunition manufactured at the LCAAP is packaged into lots. These lots consist of thousands of rounds.

30. Of the thousands of rounds of ammunition in each lot, a sampling of 150 is tested to determine whether the lot meets government specifications. If any one of the tested rounds fails, a second sampling of 150 is tested. If any one of the tested rounds in the second sampling fails, the entire lot fails, and is declared NCM. NCM cannot be sold to the U.S. Government.

31. Depending on the type of round, some NCM can be sold in the civilian sector. Though it may not meet government specifications, NCM often possess adequate functionality for civilian use. Other NCM, such as armor-piercing incendiary rounds, cannot be sold in the civilian sector. This NCM is supposed to be sent to salvage.

32. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed NCM that is sent to salvage results in a substantial cost to ATK. He believed that not only are rounds of ammunition wasted, ATK employees may be required to work additional hours to meet manufacturing quotas.

33. Accordingly, based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed it was in ATK's strong financial interest to save NCM from being sent to salvage if at all possible.

*The "Healing Wall"*

34. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed that in order to save NCM from being sent to salvage, ATK employed a so-called "healing wall."

35. The healing wall is simply a wall within the Packing area of Building Three.

36. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed that NCM would be placed against this wall until conforming lots came through testing. At that point, based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed NCM ammunition would be commingled with conforming ammunition. He reasonably and in good faith believed the resulting lots were sold to the U.S. Government. He reasonably and in good faith believed this resulted in a fraud on the U.S. Government.

*Thomas Lindly*

37. Lindly began working security at the LCAAP in August 2005. His normal working hours were from 7:30AM until 3PM, though he was on call 24 hours a day, 7 days a week.

38. In January 2007, Lindly transitioned from a security position to a manufacturing position.

39. In March 2008, Lindly became the Prime and Load Area Manager.

40. Lindly worked on the night shift that manufactured .50-caliber ammunition.

41. Lindly worked in Building Three, the only building at LCAAP where .50-caliber ammunition is manufactured.

42. Lindly's fellow managers and supervisors included:

>                Danny Harris: Building Three manager
>                Todd Langivin: Manager II, promoted in 2008 to Building 35 manager
>                Mike Robinson: Senior .50-caliber Prime and Load manager. Acting Manager II following the promotion of Todd Langivin
>                Brenna Mead: .50-caliber manufacturing, night shift, area manager, Gauge and Weigh. Ms. Mead also served as the supervisor of Packing.
>                Clayton Holland: .50-caliber manufacturing, night shift, area manager: Casings
>                JoAnn Martinez: .50-caliber manufacturing, day shift, area manager: Bullets
>                Brian Hedges: .50-caliber manufacturing, night shift, acting area manager: Bullets

43. Lindly participated in daily administrative meetings with his fellow area managers as well as superior managers.

44. Lindly acquired knowledge about the healing wall through these meetings.

45. During one particular meeting, the Gauge and Weigh Area Manager, Brenna Mead ("Mead"), told her supervisors Todd Langivin ("Langivin") and Mike Robinson ("Robinson") that the healing wall needed to be cleaned off.

46. Lindly inquired what the healing wall was. One of his co-workers, JoAnn Martinez ("Martinez"), informed him that the healing wall was an area where NCM was stored temporarily until it could be "slipped in" with conforming ammunition.

47. According to Martinez, the area was called the "healing wall" because NCM allegedly "settled" or "healed" while it was stored there.

48. As Prime and Load Area Manager, Lindly received notice whenever a lot of ammunition failed testing and was deemed NCM. This required him to evaluate whether additional employee hours were needed to compensate for the production loss. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed there was little, if any, correspondence between the amount of ammunition purportedly taken out of production as NCM, and the amount of additional hours that needed to be scheduled to make up for the purported production loss. He reasonably and in good faith

9

believed that no matter how many lots of ammunition were deemed NCM, ATK still seemed to have enough ammunition to fill the manufacturing quotas.

49. Sometime after learning about the "healing wall," Lindly had a one-on-one conversation with Robinson. Lindly expressed discomfort with the fact that NCM was being commingled with conforming ammunition, and said he would never participate in this practice.

50. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed that rather than taking steps to eliminate or curtail use of the healing wall, Robinson took affirmative steps to ensure the practice could continue.

51. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed that on at least one occasion, Robinson ran an extra weekend shift in Packing to clear off the healing wall and avoid detection by inspectors from the Department of Defense.

52. Based on information he obtained and observed while he was employed by ATK, Lindly reasonably and in good faith believed Robinson kept lots of conforming ammunition smaller so that NCM could be inserted in these lots without making them appear abnormally large.

53. Robinson began excluding Lindly from portions of management meetings where the healing wall was discussed. There were times when Lindly was literally asked to leave the room while other managers remained behind.

54. Lindly also asked other employees questions about the "healing wall" and practices related to it and NCM.

55. In January 2009, after expressing concerns to management about use of the "healing wall," Lindly was terminated from his employment at ATK. ATK gave pretextual

reasons for Lindly's termination, but in reality ATK fired Lindly because it believed he was either acting in furtherance of a private *qui tam* action or was assisting a False Claims Act investigation/suit being brought by the federal government.

*The False Claims Act and ATK*

56. The False Claims Act was enacted in 1863 to combat widespread fraud by government contractors during the Civil War. It provides that any person who (1) knowingly presents or causes to be presented to an official or employee of the United States Government a false or fraudulent claim for payment or approval, or (2) knowingly makes or uses a false record or statement to get a false or fraudulent claim paid or approved by the Government, or (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid, is liable to the Government for a civil penalty of $5,000 to $10,000 and treble damages. 31 U.S.C. § 3729(a).

57. Quite simply, the Act was and is intended to prevent fraud against the United States. An important component of this vital public policy is the protection of employees who blow the whistle on such conduct when they reasonably and in good faith believe such fraud is occurring. This vital public policy would not be furthered if an employee were protected only if they were ultimately able to prove the fraud actually occurred.

**Cause of Action – Violation of Title 31 U.S.C. Section 3730(h)**

58. Lindly incorporates the foregoing allegations as if fully set forth herein.

59. Lindly engaged in lawful conduct in furtherance of an action under 31 U.S.C. § 3730.

60. Lindly was discharged or otherwise discriminated against in the terms or conditions of his employment by ATK because of his lawful conduct in furtherance of such action.

WHEREFORE, Lindly prays:

(i) That this Court enter a judgment against Defendant in an amount equal to two times the amount of back pay to which he is entitled as a result of his wrongful discharge, plus interest on said back pay;

(ii) That this Court enter a judgment against Defendant in an amount sufficient to compensate him for any special damages he sustained as a result of his wrongful discharge;

(iii) That this Court enter a judgment against Defendant in an amount sufficient to compensate him for the emotional distress he sustained as a result of his wrongful discharge;

(iv) That he recover all costs of this action, with interest;

(v) That he be awarded all reasonable attorneys' fees in bringing this action; and

(vi) That he be reinstated to his position of employment with ATK as it existed prior to his wrongful discharge or, in the alternative, that he receive an award of front pay.

### Request for Jury Trial

Relator Thomas Lindly requests a trial by jury on all issues so triable.


Dated:_____June 18, 2010_____

Respectfully submitted,

**EMPLOYEE RIGHTS LAW FIRM --
LAW OFFICES OF MARK A. JESS,
LLC**

By:_____ /s/ Mark A. Jess_____
Mark A. Jess, MO. Bar # 37946
Christie Sherman Jess MO Bar #44919
John J. Ziegelmeyer MO Bar #59042
Kansas City Livestock Exchange Building
1600 Genessee, Suite 842
Kansas City, Missouri 64102
816-474-4600
Fax: 816-474-4601

**THE LUNCEFORD LAW FIRM**
David A. Lunceford, MO Bar # 47014
201 N.E. 1st Street
Lee's Summit, MO 64063
816-525-4701
Fax: 816-347-0366

**ATTORNEYS FOR RELATOR**